E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
SCOTT M. LARA (Cal. Bar No. 296944)
Assistant United States Attorneys
Violent & Organized Crime Section
     1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-0427
     Facsimile: (213) 894-3713
     E-mail:    scott.lara@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Nos. ED CR 19-0114-JGB-1 |
|---|---|
| Plaintiff, | ED CR 19-0125-JGB-1<br>ED CR 19-0126-JGB-1 |
| v. | GOVERNMENT'S POSITION REGARDING THE SENTENCING OF DEFENDANT CARLOS ANTONIO AZNARAN |
| CARLOS ANTONIO AZNARAN, | |
| Defendant. | Hearing Date: October 23, 2023<br>Hearing Time: 2:00 PM |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Scott M. Lara, hereby files its Position Regarding the Sentencing of defendant CARLOS ANTONIO AZNARAN.

///

///

This argument is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 6, 2023                Respectfully submitted,

                                              E. MARTIN ESTRADA
                                              United States Attorney

                                              MACK E. JENKINS
                                              Assistant United States Attorney
                                              Chief, Criminal Division

                                                */s/ Scott M. Lara*
                                              SCOTT M. LARA
                                              Assistant United States Attorney

                                              Attorneys for Plaintiff
                                              UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES..................................2

I.   INTRODUCTION......................................................2

II.  STATEMENT OF FACTS................................................2

     A.   Charges......................................................4
          1.   Methamphetamine Case....................................4
          2.   Heroin Case.............................................4
          3.   Jail Smuggling Case.....................................5
     B.   Pre-Sentence Report..........................................5

III. GOVERNMENT'S SENTENCING POSITION..................................6

     A.   Nature and Circumstances of the Offense......................6
     B.   Need to Reflect the Seriousness of the Offense and
          Provide Just Punishment, Deterrence, and Protecting
          the Public...................................................9
     C.   Characteristics of the Defendant............................10
     D.   The USPO's recommendation is Unsupported by the Record...10

IV.  FORFEITURE.......................................................13

V.   CONCLUSION.......................................................14

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

From about 2017 until about April 2019, defendant CARLOS ANTONIO AZNARAN ("AZNARAN" or "defendant") was the link between the source of supply in Mexico and his neighborhood's street level dealers of methamphetamine, heroin, and other drugs.  Defendant was also the link between drug smugglers and many inmates at a San Bernardino County Jail.  (PSR ¶¶ 50-86.)  Defendant's conduct also included possessing loaded firearms to protect his drug shipments and drug stashes, recruiting his wife and her friends to assist him, and engaging in promotional money laundering to pay the source of supply in Mexico.  Defendant's low-end guidelines sentence is 360 months' imprisonment.

Nevertheless, the government is recommending a significant downward departure, 240 months' imprisonment, for defendant's conduct.  This sentence factors in defendant's acceptance of responsibility and hardships in his past balanced against defendant's pervasive criminal conduct.[1]  This is a substantial downward departure for defendant and is lowest sentence that still achieves the sentencing goals of 18 U.S.C. § 3553(a).

**II.  STATEMENT OF FACTS**

Defendant arranged for regular illegal drug shipments from the source of supply in Mexico, including almost nine kilograms of actual

---

[1] The government's sentencing position recommends 20 years' imprisonment, no more.  The government's arguments in aggravation is in opposition to the 16 year recommendation by the USPO, not for anything beyond the 20 years agreed to in the plea agreement as the maximum sentence.  The government believes a 20 year sentence is appropriate taking into account all of the mitigating factors present in the PSR.

2

methamphetamine in December 2017, in furtherance of one of his three drug conspiracies. (PSR ¶ 61.) Defendant was in direct communication with the sources of supply in Mexico and was captured on wiretap calls ordering 15 pounds of methamphetamine on December 1, 2017 from the source of supply in Mexico. (PSR ¶ 56.) The next day, defendant told a co-conspirator that he would provide over 1,000 grams of methamphetamine to him. (PSR ¶ 57.) Three days later, law enforcement intercepted 8,854 grams of actual methamphetamine that defendant admitted was part of the conspiracy, and that defendant was at the location waiting for the delivery. (Dkt. 369 at 12; PSR ¶ 61.) Defendant did all this as a documented Westside Verdugo gang member. (PSR ¶ 87.)

Defendant also paid the sources in Mexico for the shipments of methamphetamine, committing promotional money laundering in the process. (PSR ¶¶ 52-62.) Defendant would then store and package the methamphetamine, to later distribute it to other co-conspirators for resale. (PSR ¶ 51.) Defendant also obtained, possessed, and distributed or intend to distribute heroin and fentanyl to other co-conspirators to sell to customers. (PSR ¶¶ 68, 72.) Defendant chose to commit these crimes while armed with multiple loaded firearms. (PSR ¶ 74.) Defendant was a felon at the time he possessed these firearms. (PSR ¶ 75.)

Defendant also coordinated directly with inmates in the San Bernardino County Jails to smuggle them drugs while they were incarcerated. (PSR ¶ 77.) Defendant obtained multiple smugglers and provided the drugs to the smugglers to be introduced into San Bernardino County Jail system for members of defendant's gang, and others in the jails. (PSR ¶¶ 77-87.) Defendant would then

communicate with the intended incarcerated recipients to determine if the attempt was successful, before planning the next smuggling attempt, and finding another smuggler. (PSR ¶¶ 80, 83.)

**A.     Charges**

On October 3, 2022, defendant AZNARAN pled guilty to Counts 1, and 11-15 in United States v. Carlos Antonio Aznaran, et al., ED CR 19-0114-JGB-1 ("Methamphetamine Case"); Counts 1 and 6 in United States v. Carlos Antonio Aznaran, et al., ED CR 19-0125-JGB-1 ("Heroin Case"); and Count One in United States v. Carlos Antonio Aznaran, et al., ED CR 19-0126-JGB-1 ("Jail Smuggling Case").

1.     Methamphetamine Case

In the Methamphetamine Case, defendant pled guilty to Count 1 for conspiracy to possess and intend to distribute approximately 10 kilograms of actual methamphetamine. (Dkt. 369 at 13; PSR ¶ 65.) At least 8.8 kilograms of this methamphetamine was either found in defendant's possession or was purchased by defendant and intercepted on route to defendant. (Dkt. 369 at 11-13; PSR ¶¶ 56, 61, 64.) Defendant possessed a firearm while engaging in these crimes. (PSR ¶ 64.) Defendant also pled guilty to Counts 11-15 to international proportional money laundering, for making at least five payments to the source of supply in Mexico for bulk methamphetamine shipments. (Dkt. 369 at 11-13; PSR ¶¶ 52-53, 55, 62, 66.)

2.     Heroin Case

In the Heroin Case, defendant pled guilty to Count 1 for being a primary participant in a Heroin distribution conspiracy which involved more than 1 kilogram of heroin. (Dkt. 369 at 13; PSR ¶ 67.) Defendant also admitted that he personally possessed over 100 grams of fentanyl. (Dkt. 369 at 14; PSR ¶ 72.) Defendant also pled guilty

to possessing three firearms, while being a felon, as charged in Count 6.  (Dkt. 369 at 15; PSR ¶ 74.)

### 3. Jail Smuggling Case

In the Jail Smuggling Case, defendant pled guilty to Count 1 for conspiring to distribute at least 121 grams of actual methamphetamine and 85 grams of heroin into the San Bernadino County Jails.  (Dkt. 369 at 16-17; PSR ¶ 86.)  This included defendant personally coordinating between co-conspirators in the jail system ordering drugs, hiding drugs inside smugglers, and instructing the smugglers on how to get arrested and who to provide the smuggled drugs to. (PSR ¶¶ 77-85.)  Defendant did this on at least four occasions.  (PSR ¶¶ 77-85.)

**B.   Pre-Sentence Report**

On September 17, 2023, the U.S. Probation Office ("USPO") filed a Presentence Report ("PSR") which found that defendant's criminal history category was VI[2] and had a guidelines sentencing range of 360 months to lifetime imprisonment.  (Dkt. 264, ("PSR") ¶¶ 131, 161.) The government believes the PSR's criminal history calculation and the guidelines sentencing range is correct.[3]

---

[2] The plea agreement stated that defendant's prior convictions put him in Criminal History Category V or VI.  The PSR is correct and he is properly calculated as category VI.  Defendant has a twin brother who also has a criminal history and who is named "Carlos ALFREDO Aznaran."  However, all of the criminal history referenced in the PSR correspond to abstracts of judgment in defendant's name "CARLOS **ANTONIO** AZNARAN's" full name.  The government has attached the abstracts of judgment for each conviction found in the PSR under seal.

[3] The governments' calculation in the plea agreement and the PSR's calculation result in different guidelines offense levels.  The government continues to advocate that it's guidelines calculation in the plea agreement should be adopted by the Court.  However, both result in the **same guidelines range** of 360 months' to lifetime imprisonment.

5

Taking into account 18 U.S.C. § 3553(a) and the relevant sentencing guidelines factors, an appropriate disposition of this case is 240 months' imprisonment, 10 years of supervised release, and nine $100 special assessments.

## III. GOVERNMENT'S SENTENCING POSITION

A sentence of 240 months' imprisonment for defendant's conduct is sufficient, but not greater than necessary, to achieve the goals of sentencing set out in 18 U.S.C. § 3553(a).

### A. Nature and Circumstances of the Offense

The nature and circumstances of the offense justify a sentence of 240 months' imprisonment. Defendant's role in each conspiracy was crucial to their success.

For example, in the Methamphetamine Case, defendant was the primary link between the Mexican source of supply for methamphetamine and the street level dealers in his neighborhood. Defendant was responsible for routine multi-pound orders, paying the Mexico source of supply, and accepting the bulk shipments from Mexico. Defendant would then personally, and using other co-conspirators including his co-habitant wife, repackaged the methamphetamine into smaller quantities then distributed it to other drug dealers in the conspiracy in exchange for a portion of their profits. (Dkt. 369 at 10-11; PSR ¶¶ 51, 142.) The quantity that defendant dealt in was sufficiently more than any one single street level dealer would sell, as he obtained over 10 kilograms of methamphetamine in the course of a few months. (PSR ¶¶ 56-58, 61, 65.)

Defendant is significantly more culpable than a street level dealer or a courier. He was responsible for the importation of kilograms of methamphetamine at a time, and broke it into smaller

6

shipments and distributed it to other dealers within the neighborhood.  Furthermore, the quantity that he was dealing in shows the scale of his operation, enabling dangerous drugs to flood an entire neighborhood, rather than just affecting a few customers.  Moreover, defendant's conduct was dangerous.  Defendant stored these drugs in his home with his wife and her children, along with his loaded firearms, making his conduct even more dangerous.[4]  (PSR ¶¶ 64, 142-143.)

Defendant's conduct was similar during the Heroin Case.  Defendant's role was to possess heroin and distribute it to other re-sellers who would provide defendant with a portion of their profits.  (PSR ¶ 67.)  Defendant did all this while also possessing a significant quantity of fentanyl, which could be passed off as heroin but is far more deadly, and while possessing loaded firearms.  (PSR ¶¶ 72-74.)  Defendant's conduct goes far beyond a typical street level dealer just trying to support his habit.  Defendant's conduct is more akin to facilitating the widespread drug trafficking affecting an entire neighborhood.

Defendant's conduct during the Jail Smuggling Case was even more egregious.  Throughout the conspiracy, defendant helped coordinate with incarcerated members of the conspiracy and the members of the conspiracy not in custody to get their drug orders, then obtained smugglers, and sent them into the jail.  (PSR ¶ 77.)

Defendant's personal involvement in the conspiracy included coordinating at least four known smuggling attempts, which resulted

---

[4] The PSR says co-defendant MONTES lives with her children now. It is unclear based on the police reports if she lived with her children when co-defendant MONTES lived with defendant during this conspiracy.

7

the interception of approximately 121 grams of actual methamphetamine, 86 grams of heroin, and at least 10 syringes. (PSR ¶¶ 79, 82, 85.) All of the smugglers that defendant helped recruit and coordinate the smuggling attempts for had these items hidden in their anal cavities. (PSR ¶¶ 79, 82, 85.) Defendant was also successful on at least one occasion. (PSR ¶ 83.)

Defendant's job was to take drug orders from inmates in the prison, obtain the drugs they requested, find the smugglers, send the smugglers in, then call the inmates to ensure the drugs got to their intended recipients. (PSR ¶¶ 77-86.) Defendant never smuggled the drugs in himself, he used the more desperate co-defendants, such as HARRIS, MADRID. Defendant would provide the drugs, then have them insert the drugs into their anal cavity get arrested and smuggle the drug into the custody facility for him. Defendant is more culpable for the conspiracy than the individual smugglers since he was instrumental to its operation of the entire conspiracy, and was responsible for repeated rather than a singular smuggling attempt.

Defendant was also responsible for the inception of the conspiracy. (PSR ¶ 78.) Rather than responding to a desperate situation like many of his co-defendants, defendant created this conspiracy to take advantage of an opportunity to smuggle drugs into custody facilities for additional profit and street credit.

Defendant's conduct was particularly egregious because it shows that defendant was willing to prey on a vulnerable population in his drug dealing. For some inmates, prison is one of the few places they are separated from the destructive influences in their lives, including drugs. Defendant's role in procuring smugglers and introducing drugs into the prison system threatened that opportunity

8

for these inmates, all for his own personal benefit.  Defendant's conduct showed a willingness to prey on a vulnerable group of people, many of whom were undoubtedly taking advantage of their custody time to regain sobriety.

Of all people, defendant should know how malicious the introduction of drugs into the prison system can be.  Defendant himself says he used heroin for the first time in prison, and now uses it regularly.  (PSR ¶ 150.)  For defendant to then turn around and introduce heroin and methamphetamine into prison (while he remained on the outside) is particularly appalling conduct from somebody who knows how his actions can derail other's lives.

As a result, the government believes the government's recommended sentence, which is still 10 years below the low end of the sentencing guidelines, properly captures the seriousness of defendant's conduct while balancing the mitigating factors present in defendant's background.  Accordingly, the government recommends a 240 month sentence of imprisonment.

**B.   Need to Reflect the Seriousness of the Offense and Provide Just Punishment, Deterrence, and Protecting the Public**

To reflect the seriousness of the offence, provide a just punishment, protect the public from defendant, and to deter defendant and others, a 240 month sentence is appropriate.  Defendant's conduct consisted of importing and distributing enough drugs for a host of neighborhood drug dealers, laundering money to send directly to the source of supply to encourage further drug production, and smuggling drugs into the jail system.  The seriousness of these offenses is extremely high, as reflected in defendant's guidelines sentencing range of 360 months' to life imprisonment.

9

A significant sentence in this case will have a significant deterrence affect on both this defendant and others in the community. Defendant's conduct was egregious, pervasive, constant, and dangerous. Not only was he harming an entire community, he was engaged in three separate drug trafficking conspiracies. The goal of one of these three conspiracies was to prey on incarcerated people addicted to drugs, all for profit and street credit. That he did this while armed with loaded firearms, and in possession of a significant quantity of fentanyl which is responsible for overdose deaths around the country, raised the danger even further.

A substantial sentence, such as 240 months, strikes the right balance between giving defendant time for rehabilitation, which defendant's conduct shows he desperately needs, showing the public that these crimes will not be tolerated, and providing a just and fair punishment. A sentence of 240 months' imprisonment is appropriate here.

### C. Characteristics of the Defendant

Defendant characteristics supports the proposed sentence, which is a 10 year downward departure from the low-end of his guidelines range. Defendant undoubtedly had struggles with his father dying when he was 15 years old, and substance abuse. (PSR ¶¶ 141, 150.)

The government believes that these mitigating factors are accurately captured in the government's recommendation of 240 months' imprisonment.

### D. The USPO's recommendation is Unsupported by the Record

The USPO recommends that the Court downward depart <u>14 years</u> below the low-end of the guidelines range, after acceptance of responsibility. This is not supported by the record. USPO's

10

recommendation for a 47% lower than the typical low-end defendant who pled guilty to these crimes is not warranted.  The probation department appears to believe defendant deserves an <u>additional</u> four year downward variance (on top of the 10 year downward variance argued for by the government) because defendant's father died 13 years ago, and because defendant has dependents (that will no longer be dependents when he is released from custody).  (PSR ¶ 183.) Neither of these reasons explain, excuse, or exculpate defendant from his repeated and pervasive criminal conduct, nor do they promote a 14 year downward departure.

Defendant's father's death does not excuse defendant's almost constant criminal conduct his entire adult life, which continued to his arrest in this case.  All families have hardship and death. However, that does not, and cannot, serve as a blank check for defendant to continually lead a life of crime.  Nor does that explain any of the criminal behavior here.

Since then defendant has:

- two juvenile conviction,
- a conviction for assault, where he hit another man with a 3" metal pole breaking his front tooth,
- two convictions for felon in possession of a firearm twice,
- was convicted of a fourth felony.

Now, defendant is being sentenced for money laundering on behalf of a drug supplier from Mexico, and was the hub of drug distribution for three separate conspiracies containing 29 other co-defendants.  (PSR ¶¶ 125-128.)  Defendant's family's loss over 13 years does not support a further downward departure defendant's 5th adult felony after that loss.

11

Second, USPO seems to argue that defendant should be released from prison as early as possible because he needs to support his dependents. (PSR ¶ 183.) Defendant's step-children will be at least 22 years old and no longer his dependents should they be released when USPO recommends. Nothing in 18 U.S.C. § 3553(a) supports the argument that a defendant should receive a lighter prison term than others because his wife has adult children.

Furthermore, the PSR does not analyze defendant's statements how defendant financially supported his stepdaughters with only two months of employment and no income from 2018 to his arrest. (PSR ¶ 142, 157-158, 161.) Thus, there is nothing to support USPO's assumption that AZNARAN will financially support anyone his adult stepchildren if released four years early.

Third, the US Probation Office says that defendant should receive a lower sentence because he uses heroin. However, the nature of defendant's drug use that he of all people knows how dangerous his conduct is, and yet he engaged in it anyway. This is actually an aggravating factor.

Defendant states he became addicted to heroin while in prison in 2014 and 2017. (PSR ¶ 151.) Then in 2018, after he was released from prison, defendant proceeded to smuggle drugs into prison for other inmates to become addicted and/or not escape their existing addictions. Defendant of all people should know how destructive the drugs that he peddles to the community and prisons are yet he did it anyway for his own personal profit. Far from somebody who did not know any better, defendant knew exactly how damaging his conduct was, and did it anyway.

12

Moreover, the quantity that defendant was involved in procuring and selling shows he was more than a street level dealer just trying to feed his habit. Defendant's conduct was that of a wholesaler and importer, trying to turn a significant profit and earn a significant amount of street credit by being a source of supply for multiple street level dealers and a custody facility.

Furthermore, the government's recommendation of an already substantial downward departure already adequately takes into account all of these mitigating factors. The government's 10 year downward departure, rather than USPO's 14 year downward departure is the appropriate balance of the factors present in 18 U.S.C. § 3553(a).

A sentence of 240 months' imprisonment reflects the seriousness of the offense, promotes respect for the law, deters future criminal conduct, avoids unwarranted sentencing disparities, provides just punishment, protects the public, the reflects the defendant's and offenses' nature and circumstances. The sentence strikes the appropriate balance between holding defendant responsible for his actions and taking defendant's life experiences into account.

## IV. FORFEITURE

Defendant also agreed to forfeit all claims, rights, and title, to all of the firearms and ammunition seized by law enforcement from his home on January 17, 2018 and March 22, 2018, as enumerated in Count 6 and Count 9 of the Heroin Case Indictment.

These firearms and ammunition are as follows:

The January 17, 2018 Firearms & Ammunition-

- a loaded Smith & Wesson model SD40VE, .40 caliber pistol, bearing serial number FWK4831,
- a loaded Hi-Point Firearms model CF380, .380 ACP caliber pistol, bearing serial number P8062207

13

- a Century Arms International 7.62mm pistol, bearing serial number V10597

- a Glock model 27, .40 caliber pistol, bearing serial number 15 ELL312;

- approximately 14 rounds of Winchester .40 Smith & Wesson caliber ammunition;

- approximately 4 rounds of Speer .40 Smith & Wesson caliber ammunition;

- approximately 1 round of Starline .40 Smith & Wesson caliber ammunition;

- approximately 8 rounds of Winchester .380 auto caliber ammunition;

- approximately 1 round of Remington .40 Smith & Wesson caliber ammunition;

- approximately 2 rounds of Fiocchi .40 Smith & Wesson caliber ammunition;

- approximately 96 rounds of Winchester .22LR caliber ammunition;

- approximately 4 rounds of Cascade Cartridges, Inc. .22LR caliber ammunition; and

- approximately 50 rounds of Cascade Cartridges, Inc. 9mm Luger caliber ammunition.

The March 22, 2018 Firearms & Ammunition-

- a Charter Arms model Off Duty, revolver, bearing serial number 992133; .38 special caliber

- approximately 3 rounds of Winchester .38 special caliber ammunition;

- approximately 1 round of Remington .38 special caliber ammunition;

- approximately 1 round of Arms Corporation of the Philippines .38 special caliber ammunition.

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 240 months' imprisonment, to be

14

1 followed by 10 years of supervised release, and impose the nine
2 mandatory $100 special assessments.  The government also respectfully
3 requests that the Court issue a forfeiture order for the above listed
4 firearms and ammunition.